UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

DENISE A. FASSI,

                      Plaintiff,                    15 CV 6871-JGK

          -against-


CATHOLIC HEALTHCARE SYSTEM, d/b/a,
ARCHCARE,


                    Defendant.
_____

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1.      This is a whistleblower retaliation action by Denise A. Fassi ("Fassi" or "Plaintiff"), who originally commenced this action under seal as United States ex. rel Jane Doe, against defendant Catholic Healthcare System, d/b/a, Archcare ("Archcare," "Defendant ArchCare" or "Defendant") under the anti-retaliation provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), for two times lost compensation, incidental damages, attorneys' fees and litigation expenses and all other relief to which she is entitled because of Defendant's wrongful retaliation against Fassi for engaging in lawful and protected whistleblowing activities under the FCA.

### NATURE AND OVERVIEW OF THE ACTION

2.      As set forth more fully below in this first amended complaint, Defendant and related persons or entities violated the FCA by: (a) engaging in Medicare Advantage (sometimes referred to herein as "MA") Program risk assessment factor manipulation ("Risk Score Manipulation"), whereby Defendant reported or caused others to report to the government that

1

residents of nursing homes were sicker than they actually were order in order to increase Defendant's and other providers' receipt of periodic capitation reimbursements; and (b) retaining Medicare overpayments that Defendant and others received through such unlawful risk score manipulation ("Wrongful Retention").

3.       During her employment with Defendant, Plaintiff investigated and uncovered Defendant's and related persons' or entities' improper Medicare MA billing and retention practices (as summarized above and described in detail throughout this first amended complaint) and attempted to stop further violations of the FCA.   Plaintiff reported her findings to supervisory employees at Defendant, as well as, members of Defendant's Compliance and Human Resources Departments.  Defendant responded by harassing, menacing, marginalizing and ostracizing Plaintiff.  Defendant also suspended Plaintiff's employment and gave her a false negative work review.   Additionally, Defendant encouraged an atmosphere of work place hostility against Plaintiff because of her lawful whistleblowing activities.   Individually and cumulatively, Defendant's succession of retaliatory acts against her led to Plaintiff's constructive discharge from employment with Defendant.

4.       As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, lost income and other economic losses, physical injuries and emotional distress, and other incidental damages, the precise nature and amount of which will be determined at trial.

## JURISDICTION

5.       The Court has subject matter jurisdiction over the federal claims alleged in this complaint under 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (federal question).

6.     The Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant can be found, resides, and transacts business in the Southern District of New York and because an act proscribed by 31 U.S.C. § 3729 occurred within this District. Section 3732(a) further provides for nationwide service of process.

## VENUE

7.     Venue lies in the Southern District of New York under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a) because Defendant is located and transacts business in this District, and because a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3730(h) alleged in this complaint occurred in this District.

## PARTIES, ENTITIES, AND INDIVIDUALS

8.     The United States, through the United States Department of Health and Human Services ("HHS"), was the real parties in interest with respect to the *qui tam* claims in the original complaint in this action.

9.     HHS is located at 200 Independence Avenue, SW, Washington, DC 20201. Within HHS, the Centers for Medicare and Medicaid Services ("CMS") administers and funds the Medicare program and co-funds the Medicaid program.  CMS is located at 7500 Security Boulevard, Baltimore, Maryland, 21244-1850.

10.     Plaintiff is the real party in interest with respect to the whistleblower retaliation claim alleged in this first amended complaint.  Plaintiff is a citizen of the United States and a resident of New York.  At times relevant to this action, Plaintiff was employed by Defendant as a Risk Adjustment Hierarchical Condition Category (HCC) Clinical Coding Reviewer.  Among her nominal duties, Plaintiff was tasked with reviewing medical record documentation and Medicare diagnostic and billing codes to ensure that Defendant's requests to CMS for MA reimbursement

3

for nursing home residents under CMS' Medicare Risk Adjustment initiatives were properly supported.  From Defendant's standpoint, however, Plaintiff's actual purpose was to "optimize" such reimbursements by findings ways to increase ("pull up") the nursing home residents' risk assessment scores, not correct scores downward if that was only what the medical records supported.

11.    Defendant Archcare, EID 13-3896624, is organized as a New York State not-for-profit charitable organization under § 501(c)(3) of the IRS Internal Revenue Code.  It is a healthcare delivery system composed of hospitals, nursing homes, managed care plans and other entities that deliver and provide for the delivery of healthcare services in the greater New York and Hudson Valley areas and elsewhere.  Defendant Archcare is affiliated with, and guided by, the Roman Catholic Archdiocese of New York.  Defendant Archcare's headquarters is located at 205 Lexington Avenue, 2d Floor, New York, NY 10016.  It also has administrative offices at 33 Irving Place, 11th Floor, New York, NY 10003, which is where Plaintiff was based. Defendant Archcare paid Plaintiff through Catholic Resources Inc., EID 26-1306110, which is also located at Defendant's offices at 205 Lexington Avenue, 2d Floor, New York, NY 10016.

12.    Defendant's stated mission "is to foster and provide faith based holistic care to frail and elderly people unable to fully care for themselves."  Defendant Archcare seeks to achieve this mission by, among other things, owning, operating and managing, and/or providing administrative and healthcare services to, traditional long-term residential facilities (that is, "nursing homes," also called "Skilled Nursing Facilities" or "SNFs").  These include the following entities (referred to collectively in this complaint as, the "Archcare Owned or Affiliated Nursing Homes"):

a.    Archcare at Calvary Hospital, 1740 Eastchester Road, Bronx, NY 10461.

4

b.      Archcare at Carmel Richmond Healthcare and Rehabilitation Center, 88 Old Town Road, Staten Island, NY 10304.

c.      Archcare at Ferncliff Nursing Home, 21 Ferncliff Drive, Rhinebeck, NY 12572.

d.      Archcare at Mary Manning Walsh Home, 1339 York Avenue (at 72nd), New York, NY 10021.

e.      Archcare at San Vicente De Paul Skilled Nursing and Rehabilitation Center, 900 Intervale Avenue, Bronx, NY 10459.

f.      Archcare at Terence Cardinal Cooke Health Care Center, 1249 Fifth Avenue, New York, NY 10029.

g.      The Riverside (f/k/a Kateri Residence), 150 Riverside Drive, New York, NY 10024.

h.      Elant at Goshen, 46 Harriman Drive, Goshen, NY 10924.

i.      Elant at Wappingers Falls, 37 Mesier Avenue, Wappingers Falls, NY 12590.

j.      Elant at Fishkill, 22 Robert Kasin Way, Beacon, NY 12508.

k.      Elant at Meadow Hill, 172 Meadow Hill Road, Newburgh, NY 12550.

l.      Loretto Health and Rehabilitation Center, 700 East Brighton Ave., Syracuse, NY 13205.  And,

m.      St. Cabrini Nursing Home, 115 Broadway, Dobbs Ferry, New York 10522.

13.      To further achieve its mission, Defendant also provides a variety of healthcare plans for Medicare and Medicaid eligible beneficiaries, including a Medicare contracted Advantage Health Maintenance Organization ("HMO") Special Needs Plan ("SNP") for nursing home residents, known as ArchCare Advantage (SNP).  In 2013, ArchCare Advantage (SNP) had 16,105 member months at seven related facilities (Kateri Residence, Carmel Richmond

5

Nursing Home, St. Vincent de Paul Residence, Ferncliff Nursing Home, St. Teresa's Nursing Home, Terence Cardinal Cooke Health Care Center, and Mary Manning Walsh Nursing Home), and 6,022 member months at unrelated organizations.  ArchCare Advantage (SNP) aspires to deliver all the benefits of traditional Medicare plus much more, including top-flight preventive care and personal attention from nurse practitioners ("NPs") who aim to coordinate every healthcare need of members residing in nursing homes.  The NPs are also responsible for designating the diagnostic codes used to determine the nursing home residents' MA risk scores for reimbursement purposes, and it was the NPs' determinations that Plaintiff was charged with reviewing for accuracy (from Plaintiff's point of view) or optimizing (from Defendant's point of view).

14.    ArchCare Advantage (SNP) is provided through, and managed by, ArchCare Advantage, EIN 06-1808591, a New York limited liability corporation with main offices located at 205 Lexington Avenue, 2nd Floor, New York, NY 10016.  ArchCare Advantage is a Medicare Advantage Organization ("MAO").  ArchCare Advantage is controlled by its parent corporation Defendant Archcare.

15.    Providence, EIN 13-3354940, is a New York 501(c)(3) not-for-profit corporation and the sponsor of Defendant Archcare and Defendant's related entities, including ArchCare Advantage.  It is the sole corporate member of Defendant Archcare and, as such, is Defendant's parent corporation, with ultimate control and authority over Defendant Archcare and its board of trustees.  Providence is affiliated with the New York Catholic Archdiocese and its principal address is 1011 1st Avenue, New York, NY 10022.

16.    Defendant had gross receipts in 2013 of $ 72,919,421, which was comprised of patient service revenue ($39,140,619) insurance premiums ($20,051,369) and management

6

service assessments ($13,661,590).  More than 99% of such receipts came from public support,

including Medicare and Medicaid.

17.     ArchCare Advantage had total income in 2013 of $ 41,157,926.

## FALSE CLAIMS LIABILITY UNDER THE FCA

18.     The FCA, as amended on May 20, 2009, imposes civil liability on "any person"

who, among other things:

(A)  knowingly presents, or causes to be presented, a false or fraudulent claim for
payment or approval;

(B)  knowingly makes, uses, or causes to be made or used, a false record or statement
material to a false or fraudulent claim;

(C)  conspires to commit a violation of [subsection 3729(a)(1) the FCA]…or

(G)  knowingly makes, uses, or causes to be made or used, a false record or statement
material to an obligation to pay or transmit money or property to the Government, or
knowingly conceals or knowingly and improperly avoids or decreases an obligation to
pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(1)(A), (B), (C) and (G)  (May 20, 2009).

## FCA LIABILITY AND DAMAGES FOR RETALIATION

19.     Section 3730(h) of the FCA provides:

(1) Any employee, contractor, or agent shall be entitled to all relief necessary to
make that employee, contractor, or agent whole, if that employee, contractor, or
agent is discharged, demoted, suspended, threatened, harassed, or in any other
manner discriminated against in the terms and conditions of employment because
of lawful acts done by the employee, contractor, agent or associated others in
furtherance of an action under this section or other efforts to stop 1 or more
violations of this subchapter.

(2) Relief under paragraph (1) shall include reinstatement with the same seniority
status that employee, contractor, or agent would have had but for the
discrimination, 2 times the amount of back pay, interest on the back pay, and
compensation for any special damages sustained as a result of the discrimination,

including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

## **RELEVANT FCA DEFINITIONS**

20.     For purposes of the FCA, "claim" means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that  (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or  (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  31 U.S.C. § 3729(b)(2)(A).

21.     For purposes of the FCA, "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b).

22.     For purposes of the FCA, "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.  31 U.S.C. § 3729(b)(3).

23.     For purposes of the FCA, "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  31 U.S.C. § 3729(b)(4).

## PATIENT PROTECTION AND AFFORDABLE CARE ACT

24.     Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Program Integrity Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010) ("PPACA"), defines what constitutes an "overpayment" under the FCA in the context of federal healthcare programs.  According to Section 6402(a) overpayments are "any funds that a person receives or retains under Title XVIII [Medicare] or XIX [Medicaid] to which the person, after applicable reconciliation, is not entitled."  42 U.S.C. § 1320a–7k(d)(4)(B).

25.     Under 42 U.S.C. § 1320a-7k(d)(2), the recipient of an "overpayment" from Medicare or Medicaid must report it to the government insurers and must return the overpayment within 60 days from when it was first identified (or reasonably should have been identified), or the date any corresponding cost report is due, whichever is later.

26.     42 U.S.C. § 1320a-7k(d)(3) further provides that the failure to timely return an overpayment is an "obligation" to the federal government within the meaning of § 3729(b)(3) of the FCA.

27.     By operation of the above, the failure to reimburse Medicare or Medicaid for an overpayment within 60 days is a so-called "reverse false claims violation" under the FCA.  See 31 U.S.C. § 3729(a)(1)(G).

## MEDICARE GENERALLY

28.     Medicare, enacted in 1965 under Title XVIII of the Social Security Act [42 U.S.C. §§ 1395 et seq.], is a third party reimbursement program that underwrites the medical expenses of qualified elderly and the disabled persons (i.e., Medicare "Beneficiaries").  Medicare reimbursements are paid from CMS, through intermediaries, such as private insurers, to participating healthcare providers (i.e., Medicare "Providers").  Medicare reimbursements to

9

Providers are paid from the Federal Hospital Insurance Trust Fund and/or the Federal Supplementary Medical Insurance Trust Fund depending on the type of healthcare services or goods being reimbursed (e.g., hospitalization, physician care or drugs).

29.     Medicare is comprised of four distinct parts, designated as Parts A through D. Medicare Part A (Hospital/Hospice Insurance) covers in-patient hospital services.  Medicare Part B (Medical Insurance) covers physician services, including medical and surgical treatment and outpatient treatment and diagnosis, as well as a variety of healthcare related supplies and durable medical equipment.  Part C (Medicare Advantage Plans) covers managed health care preferred provider organizations ("PPOs") or health maintenance organizations ("HMOs") that serve as substitutes for original Medicare Parts A and B benefits.  And, Medicare Part D (Prescription Drug Plans) covers part of the cost of prescription drugs and prescription drug insurance premiums.

30.     The FCA Medicare *qui tam* violations at issue in this retaliation action arose principally under Medicare Part C as a result of Defendant's (and related persons' or entities') manipulation of nursing home beneficiaries' MA risk scores in order to improperly increase Defendant's (and related persons' or entities') receipt of monthly capitated reimbursements from CMS.

## MEDICARE PART C

31.     The Balanced Budget Act of 1997 ("BBA") established Part C of the Medicare program, known then as the Medicare+Choice (M+C), effective January 1999.  As part of the M+C program, the BBA authorized CMS to contract with public or private organizations to offer a variety of health plan options for beneficiaries, including both traditional managed care plans (such as those offered by HMOs under §1876 of the Social Security Act) and new options that

were not previously authorized.  Four types of M+C plans were authorized under the new Part C of Medicare: (a) Coordinated care plans, including: Health Maintenance Organizations ("HMOs") (with or without Point-of Service options ("POS")); Provider Sponsored Organizations ("PSOs"); and Preferred Provider Organizations ("PPOs"); (b) Medicare Medical Savings Account ("MSA") plans; (c) Private Fee-for-Service ("PFFS") plans; and (d) Religious Fraternal Benefit ("RFB") plans.

32.     The M+C program in Part C of Medicare was renamed the Medicare Advantage Program pursuant to Title II of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108-173), which was enacted on December 8, 2003. The MMA updated the choice of plans for beneficiaries under Part C, and changed the way benefits are established and payments are made.  Under the MMA, beneficiaries can choose from additional plan options, including regional PPO ("RPPO") plans and special needs plans ("SNPs").  The False Claims Act violations at issue in this retaliation action arose from Defendant's (and related persons' or entities') operation of an SNP, namely, ArchCare Advantage SNP.

## MEDICARE SNPs

33.     Medicare SNPs limit membership to people with specific diseases or characteristics, and their purpose is to tailor benefits, provider choices, and drug formularies to best meet the typical expected healthcare costs common to the specific groups they serve.

34.     Beneficiaries can enroll in a particular Medicare SNP if they have Medicare Part A and Medicare Part B, live in the plan's service area, and meet the plan's eligibility requirements.  Beneficiaries generally still pay the Part B premium, although in some cases the plan may cover part or the entire Part B premium as a plan benefit.  Beneficiaries also generally

pay a Medicare SNP premium that helps cover costs of providing Part A and Part B benefits, prescription drug coverage, and any other extra benefits the plan offers.

35.     The insurers who run Medicare MA SNPS are known as Medicare Advantage Organizations ("MAOs").

36.     There are three types of Medicare SNPs: (a) Chronic Condition SNPs (C-SNPs) for those with chronic conditions, such as, HIV/AIDS, Cancer, Dementia, etc.; (b) Dual Eligible SNPs (D-SNPs) for those with Medicare and Medicaid; and (c) Institutional SNPs (I-SNPs).  The latter limits membership to persons living in institutions (like nursing homes), or those requiring nursing care but still living at home.

37.     This violations of the FAC at issue in this retaliation action concern capitated reimbursements to an I-SNP, namely, ArchCare Advantage (SNP).  ArchCare Advantage (SNP) is an I-SNP administered by MAO ArchCare Advantage that limits membership to persons living in nursing homes --many of which are owned, operated or managed by Defendant.

## MEDICARE MA BILLING AND REIMBURSEMENT

38.     CMS reimburses MAOs, including ArchCare Advantage, with monthly capitated payments that are periodically adjusted upward or downward depending on the severity of healthcare issues which their members typically face, i.e., Risk Adjustment Factors ("RAFs").  The use of RAFs allows CMS to pay MAOs for the risk of the category of beneficiaries they enroll, instead of calculating an average amount of all MA Program beneficiaries.  By doing so, CMS is able to make appropriate and accurate payments for enrollees with differences in expected costs.  The use of RAFs also allows CMS to use standardized bids as base payments to Medicare MA plans.

39.    MAOs regularly submit risk adjustment information and data concerning their members (such as age, gender and other demographic characteristics, healthcare diagnoses and medical treatments) to CMS to affect the amount of the monthly capitated payments they receive.  Such information is reported in the form of MA risk scores ("Risk Scores").  Generally, the more frail and less healthy an MAO's plan members are reported to be as a group, that is, the higher their composite MA Risk Scores, the more money the MAO receives from CMS.  CMS calculates such risk adjusted payments pursuant to certain actuarial principles underlying what is known as the Hierarchical Condition Category ("HCC") Model.

40.    MAOs submit MA Risk Score data to CMS on a form known as a Risk Adjustment Payment System ("RAPS") report.  The forms are typically submitted monthly.

41.    The enabling laws governing CMS' administration of MA Program payments, including its risk scoring and adjustment methodology, are found in Section 1853 of the Social Security Act [42 U.S.C. § 1395w-23].

42.    The administrative agency rules for determining and adjusting MA payments from CMS are codified at 42 CFR Part 422, Subpart G, §§ 422.300 to 422.324.

43.    The MA Program policies and practices that CMS conveys to all MAOs, including, ArchCare Advantage, are set out principally in CMS' published Medicare Managed Care Manual.  Chapter 7 of the manual instructs MAOs on how to properly implement CMS' HCC rate adjustment methodology and Chapter 8 tells MAOs what steps need to be followed in order to lawfully receive MA Program payments.

44.    In general, CMS' risk adjustment methodology relies heavily on enrollee healthcare diagnoses, as specified by the International Classification of Disease, Ninth Revision

Clinical Modification ("ICD-9 Codes") guidelines, to prospectively adjust capitation payments for specific members based on their health status.

45.     MAOs, including Archcare Advantage, are required to review their members' medical records and submit their members' ICD-9 Codes to CMS monthly to develop the HCC risk scores that are used to adjust the monthly capitated reimbursements paid by CMS to that MAO.

46.     CMS also uses RAPS data to reassess its risk assessment level and capitation rates for each enrollee for the following MA Plan year.  RAPS submitted in one plan year will therefore affect the amount of capitated payments for corresponding enrollees in subsequent plan years.

47.     Since CMS relies exclusively on the MAOs' reporting of their members' ICD-9 Codes in RAPS to determine MA Program reimbursement amounts, MAOs are charged with ensuring the accuracy of such reports.  CMS has repeatedly made MAOs aware of this obligation in various public pronouncements, including CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide at p.13. ("Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's medical record.")

48.     It has been widely reported that a significant number of MAOs are not fulfilling their obligation to accurately report MA Risk Score factors to CMS.  In a practice known as Risk Score Manipulation or Score Gaming many MAOs are deceiving CMS into thinking that the MAO's members are sicker and in need of more costly healthcare services than is actually the case.  The practice of Risk Score Manipulation is of grave concern to CMS and Government officials charged with administering or overseeing Medicare.  This concern is reflected in a public letter dated May 19, 2015, from Senator Charles E. Grassley (co-sponsor of the current

14

FCA), to Attorney General Loretta Lynch, which observes that, "Reportedly, between 2008 and 2013, risk score gaming caused approximately $70 billion in improper Medicare Advantage payments."  Citing Fred Schulte, "More whistleblowers allege health plan overcharges," The Center for Public Integrity (April 23, 2015) and Fred Schulte, "Why Medicare Advantage costs taxpayers billions more than it should," The Center for Public Integrity (June 4, 2014). http://www.publicintegrity.org/2014/10/15/15942/call-more-scrutiny-private-medicare-advantage-plans and http://www.publicintegrity.org/health/medicare/medicare-advantage-money-grab.  Senator Grassley goes on to ask former Attorney General Loretta to investigate and report back to Congress on these reports of widespread fraud and abuse in the MA Program.

**FACTUAL ALLEGATIONS CONCERNING
DEFENDANT'S FRAUDULENT BILLING PRACTICES**

    **A.**    <u>**Risk Score Manipulation**</u>

    49.    From at least as early as 2010 and continuing thereafter Defendant (and related persons or entities) submitted RAPS to CMS which included ICD-9 Code data that was inaccurate and not supported by information contained in the medical records of ArchCare Advantage (SNP) members residing in Archcare Owned or Affiliated Nursing Homes.  Such inaccurate ICD-9 codes were skewed upward in terms of severity (i.e., "Upcoded") and had the effect of causing CMS to make overpayments to Defendant (and related persons or entities). NPs employed by Defendant (and related persons or entities) reviewed ArchCare Advantage (SNP) members' medical records and generated the Upcoded ICD-9 diagnoses.  Administrative personnel working out of Defendant's offices located at 33 Irving Place, 11th Floor, New York, NY electronically transmitted RAPS containing the Upcoded ICD-9 diagnoses to CMS.

50.     The table below shows specific instances in 2015 where Defendant (and related persons or entities) reported to CMS ICD-9 codes that were higher than the physician-generated information in the nursing home residents' medical records supported.  The table shows not only the improper codes that were actually reported for CMS reimbursement purposes but also the correct ICD-9 Codes that should have been used because they were supported by the medical records or an explanation as to why it was improper for Defendant (and related persons or entities) to use the reported ICD-9 Codes.

### SPECIFIC EXAMPLES OF IMPROPER ICD-9 CODING

| Resident | Facility | ICD-9 DIAGNOSIS CODES | |
|---|---|---|---|
| | | Reported Codes | Supported Codes and/or Explanations |
| KD | A | 317 | 311 |
| MI | A | 331 | 290.0 |
| | | 496 | 493.90 |
| WD | A | 296.30 | 311 |
| | | 496 | No Related Code Is Supported |
| | | 250.70 | 250.01 |
| JD | B | 318.2 | No Related Code Is Supported |
| NG | B | 290.40 | 290.21 |
| | | 428.0 | No Related Code Is Supported |
| GW | B | 404.11 | No Related Code Is Supported |
| | | 342.00-342.92 | "" |
| | | 402.90 | "" |
| PD | B | V12.54 | No Required Primary Diagnosis Is Included |
| GS | B | 290.4 | 290.3 |
| NM | B | 311.0 | No Related Code Is Supported |
| | | 530.11 | "" |
| HH | C | 783.21 | No Related Code Is Supported |
| RO | C | 496 | ICD-9 Guidelines Prohibit |
| | | 493.20 | Combining Both Codes |
| EA | D | 250.70 | 250.00 |
| JA | D | 496 | None Supported |
| | | 585.3 | |
| | | (and 40 other diagnoses) | |
| NF | D | 496 | None Supported |
| | | 585.3 | |
| | | (and 36 other diagnoses) | |
| RE | D | 496 | None Supported |

|  |  | 585.3 (and 34 other diagnoses) |  |
|---|---|---|---|
| MK | D | 496<br>585.3<br>(and 36 other diagnoses) | None Supported |
| HF | D | 496<br>585.3<br>(and 33 other diagnoses) | None Supported |
| JG | D | 496<br>585.3<br>(and 32 other diagnoses) | None Supported |
| SK | D | 496<br>585.3<br>(and 32 other diagnoses) | None Supported |
| RB1 | D | 496<br>585.3<br>(and 37 other diagnoses) | None Supported |
| RB2 | D | 496<br>585.3<br>(and 26 other diagnoses) | None Supported |
| AF | D | 496<br>493 | ICD-9 Guidelines Prohibit Combining Both Codes |
| EB | E | 317 | No Related Code Is Supported |
| AL | F | V55.5 | No Required Primary Diagnosis Is Included |

**Note: For healthcare privacy purposes the identities of the nursing home residents and the names of the facilities where they were living have been shielded in this first amended complaint.  Complete identifying information will made available to the Court and any interested parties when required or requested.**

51.     Upon information and belief, CMS used the above Upcoded ICD-9 Codes (column 3) to establish the MA Risk Scores of the nursing home residents listed in column 1.

52.     Upon information and belief, CMS electronically issued monthly capitation payments to ArchCare Advantage for the identified nursing home residents that were calculated using the Upcoded ICD-9 Codes.

53.     Upon information and belief, such payments were higher than they would have been if Defendant (and related persons or entities) had used correct ICD-9 Codes.

17

### B.   Wrongful Retention

54.     On several occasions during her employment, Plaintiff spoke to or emailed Defendant's senior management about her findings of improper MA risk score coding, medical record documentation and other practices.

55.     Defendant's management responded to Plaintiff's alerts by trying to silence her or lull her into believing that her concerns were being addressed, when they were not.

a.      As an example of the former, on June 10, 2015, Director Marino yelled at Plaintiff for "opening up a can of worms" that Ms. Marino "didn't want" and chastised Plaintiff for sending a report of her findings of improper coding to the HR Department.

b.      As an example of the latter, on June 11, 2015, Compliance Department employee Victor Fama responded to Plaintiff's alerts by saying, "Oh my God.  What carelessness.  We'll look into it."

56.     Independent of Plaintiff's internal investigations into and reports of improper MA risk score coding, Defendant was made aware of such practices through other internal and third party investigations, reviews, audits and reports.

57.     During Plaintiff's tenure, Defendant did not take any meaningful steps to remedy the false or fraudulent practices of which it had become aware through internal audits, Plaintiff's communications or other sources of information.

58.     Defendant overtly adopted and implemented a policy of not correcting past MA risk codes that were unsupported by medical record documentation and instead focused exclusively on only trying to prevent possible coding errors in the future.  As an indicia of this policy, on or about June 15, 2015, both Director Marino and Senior Director Mary Christiansen stated to Plaintiff and other employees, in sum and substance, "We're only going forward, not

backward" to remediate coding issues and "We can't go too far back" into the past to make such corrections.  Similarly, prior to her departure, Compliance Department employee Victor Fama responded to Plaintiff, who asked out loud if maybe she needed to work in a more ethical work place, by saying, "It's not a question of more ethics.  You uncovered things they don't know how to correct."

59.     Based on the foregoing, Plaintiff believes that since becoming aware of the unlawful activities alleged in this complaint, Defendant (and related persons or entities) have not refunded any monies to CMS that Defendant (and related persons or entities) received through improper MA risk coding practices.

### FACTUAL ALLEGATIONS CONCERNING
### DEFENDANT'S WRONGFUL RETALIATION AGAINST PLAINTIFF

60.     On or about March 2, 2015, Defendant hired Plaintiff to the position of Risk Adjustment Hierarchical Condition Category (HCC) Clinical Coding Reviewer.  Generally, it was Plaintiff's responsibility to review billing and medical records for all Archcare Owned or Affiliated Nursing Homes to determine if Defendant's determinations of HCC risk scores were being done correctly for the enrollees.

61.     Beginning on or about March 18, 2015, Plaintiff repeatedly discovered rampant and pervasive instances of improper diagnostic coding, medical record documentation and Medicare billing at various Archcare Owned or Affiliated Nursing Homes, including Carmel Richmond Nursing Home, Ferncliff Nursing Home, Loretto Nursing Home, Terrance Cardinal Cooke Nursing Home, St. Cabrini Nursing Home and Riverside Nursing Home.

62.     Almost immediately upon making such observations, Plaintiff reported her findings, both orally and in emails and via report cards on NP billing personnel, to her direct

supervisor (Cheryl Alford) and a director at Defendant Archcare (Phyllis Marino).  Plaintiff also urged Defendant to correct its improper billing practices prospectively and refund any overpayments that had already been received.  It turned out that this was contrary to Defendant's real purpose in assigning Plaintiff to review nursing home diagnostic coding, medical record documentation and Medicare billing records, which was to try to increase --not decrease-- Medicare billing by "pulling up" nursing home residents' risk scores.

63.     On or about June 10, 2015, after repeatedly uncovering improper coding, documentation and billing issues at various Archcare Owned or Affiliated Nursing Homes, reporting such findings to her supervisors, being urged to look only for errors of under reimbursement from Medicare in Defendant's (and related persons' or entities') favor, not overpayments that would have to be returned, and seeing no steps taken to address her findings, Plaintiff prepared and sent an email to Ms. Alford, Ms. Marino and Cary Hattery from Defendant's Human Resources Department that expressly alerted Defendant that it was committing or causing Medicare billing "fraud and abuse" at the Archcare Owned and Affiliated Nursing Homes.

64.     After sending the above-referenced June 10, 2015 email, Defendant began a campaign of harassment against Plaintiff.  This included: receiving menacing glares from Ms. Marino for weeks on end; being yelled at by Ms. Marino on June 10, 2015 for "opening up a can of worms" that Ms. Marino "didn't want"; being intentionally excluded from meetings and reviews with the Compliance Department that all other personnel attended starting on June 15 2015; suspending Plaintiff's employment for three days on June 29, 2015 for a trumped up charge of "insubordination"; taking away Plaintiff's password and access to Defendant's computer system while she was on leave between June 29 and July 13, 2015; having Plaintiff do

unrelated "paperwork" on July 13, 2015 rather than let her continue a substantive review of coding, documentation and billing; trying to arrange for Plaintiff to make pretext trip to the Loretto Nursing Home in Syracuse, New York, so that she would be out of the office during a review by regulators; and giving Plaintiff a patently false negative work performance review on July 14 2015, while refusing to allow her to object to or rebut the false criticisms of her in the review.

65.     In addition, Defendant fostered a hostile work place environment because of Plaintiff's perceived role as a whistleblower.

c.     For example, between June 10, 2015 and June 29, 2015, a fellow employee refused to engage in a simple vending machine transaction with Plaintiff because, as he stated to her sarcastically, he "didn't want to be accused of fraud."  Shortly after that exchange occurred Plaintiff complained of this harassment to, among others, Compliance Department employee Victor Fama, Senior Director Mary Christiansen and HR employee Peter Hill.

d.     As for a second example, during her employment by Defendant, fellow employee Laura Jeter ridiculed Plaintiff for being "too nit-picky" for trying to ensure that MA risk scoring was being done appropriately.

e.     As for a third example, on July 14, 2015, Plaintiff overheard Defendant's IT employee Jonathan David Cendana say to Defendant's Director of the IT Department (Paul Lutz) while Cendana was on his way to Plaintiff's office, "I'm going to fix the rat's computer."

### CLAIM FOR RELIEF

### COUNT I
### False Claims Act Retaliation Violation
### 31 U.S.C. § 3730(h)

66.     Plaintiff realleges the above allegations as if set forth fully here.

67.     By its conduct described above, Defendant, through its agents and employees, violated the whistleblower protection provisions of the FCA, 31 U.S.C. § 3730(h) by wrongfully retaliating against Plaintiff, including, by harassing Plaintiff, giving her a false negative work review and constructively terminating Plaintiff's employment because of lawful acts done by Plaintiff in furtherance of an action under the FCA and other efforts to stop one or more violations of the Act, including, by internally investigating and reporting possible FCA violations.

68.     Plaintiff has been damaged by Defendant's wrongful conduct.

## DEMAND FOR RELIEF

**WHEREFOR**, Plaintiff demands judgment against Defendant on Count I as follows:

Reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, and all other relief necessary to make Plaintiff whole; and all other appropriate relief for Plaintiff.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands that this case be tried before a jury.

Dated: September 18, 2017
        New York, NY

                        /s/ Timothy J. McInnis
                        Timothy J. McInnis, Esq. [7151]
                        McInnis Law
                        521 5th Avenue, 17th Floor
                        New York, NY 10175-0038
                        Tel. (212) 292-4573
                        Fax (212) 292-4574

22

Email: tmcinnis@mcinnis-law.com

*Attorneys for Plaintiff*